1

2

3

4                          UNITED STATES DISTRICT COURT

5                         NORTHERN DISTRICT OF CALIFORNIA

6

7    AMERICAN CIVIL LIBERTIES UNION,          Case No.  23-cv-03450-DMR

8                    Plaintiff,
                                              **ORDER ON CROSS MOTIONS FOR**
9         v.                                  **SUMMARY JUDGMENT**

10   UNITED STATES IMMIGRATION AND            Re: Dkt. Nos. 34, 60
     CUSTOMS ENFORCEMENT, et al.,
11
                     Defendants.
12

13          Plaintiff American Civil Liberties Union ("ACLU") filed this action for declaratory and

14   injunctive relief pursuant to the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552, against

15   Defendants United States Immigration and Customs Enforcement ("ICE") and United States

16   Department of Homeland Security ("DHS").  The parties filed cross motions for summary

17   judgment.  [Docket Nos. 34, 60.]  The court held a hearing on June 27, 2024 at which it ordered

18   Defendants to file supplemental evidence in support of their motion.  [Docket No. 51 (Minute

19   Order).]  For the following reasons, ACLU's motion is denied.  Defendants' motion is granted.

20   **I.   FACTUAL BACKGROUND AND PROCEDURAL HISTORY**

21          **A.      ACLU's FOIA Request**

22          ACLU alleges that ICE detains over 29,000 individuals each day in approximately 200

23   detention facilities in the United States.  Although immigrants have a right to counsel in

24   immigration proceedings, there is no right to government-appointed counsel.  As a result,

25   "[d]etained immigrants rely on private counsel, pro bono representation, or pro se representation

26   throughout their immigration proceedings."  Compl. ¶¶ 2, 3.  According to ACLU, only 14% of

27   individuals in ICE custody are represented by an attorney in their immigration proceedings.

28   ACLU alleges that "ICE detention facilities are responsible for providing a 'properly equipped law

library'" to detained individuals and that "given the overwhelming number of detained people without legal representation," "ICE's provision of electronic legal materials in detention facilities is a matter of public interest and concern." *Id*. at ¶¶ 4, 6, 7.

On March 30, 2023, ACLU submitted a FOIA request for "records related to electronic legal research media" provided by ICE to individuals detained in ICE facilities. Compl. Ex. A (FOIA Request). Specifically, ACLU requested:

1. Electronic Law Library materials provided at any Immigration Detention Facility;

2. All supporting materials related to Electronic Law Library materials provided at or to any ICE Detention Facility; and

3. Any document related to software requirements for use of Electronic Law Library materials.

*Id*. at 4. The request defined "electronic law library" as follows:

> [A]ll required and optional electronic legal research media, utilized and/or distributed by ICE to detention facility law libraries. Electronic law library materials may include, but are not limited to, materials available on CD-ROMs or External Hard Drives, materials developed by legal research vendors such as Lexis Nexis, and/or materials listed in [Performance-Based National Detention Standards] "Appendix 6.3.A: List of Legal Reference Materials for Detention Facilities" and "Appendix 6.3.B: Optional Legal Reference Materials."

*Id*. at 3. ACLU requested a fee waiver under 5 U.S.C. § 552(a)(4)(A)(ii) and (iii). Compl. ¶¶ 40, 41; FOIA Request 4-5.

DHS acknowledged receipt of the FOIA request on May 8, 2023 and notified ACLU that it was transferring the request to ICE for processing. Compl. Ex. C. ICE subsequently acknowledged receipt of ACLU's FOIA request from DHS and identified a tracking number. Compl. Ex. D. On May 24, 2023, ICE notified ACLU of its invocation of a 10-day extension to respond to the request under 5 U.S.C. § 552(a)(6)(B) and described the charges for providing records without addressing ACLU's fee waiver request. Compl. Ex. E. ACLU then requested review and determination of the fee waiver request. Compl. Ex. F. ICE notified ACLU on June 28, 2023 that it had granted ACLU's request for a fee waiver. Compl. Ex. H.

After Defendants did not release any responsive records or explain why responsive records

were being withheld, ACLU filed this lawsuit on July 11, 2023 alleging Defendants failed to make a determination on its FOIA request within the statutory timeframe and failed to make a reasonable effort to search for and release records.  *See* Compl. ¶¶ 51-57, 59-63; 5 U.S.C. § 552(a)(6)(A) (requiring agency to make a determination on a request within 20 days after receipt).

In October 2023, Defendants produced documents responsive to category 2 of the request, which calls for "supporting materials related to Electronic Law Library materials."  [Docket Nos. 19 (Oct. 11, 2023 Jt. CMC Statement) 3; 41 (Jones Decl. Feb. 28, 2024) ¶ 12.]  Defendants also advised ACLU that documents responsive to category 3 ("document[s] related to software requirements") do not exist.  Oct. 11, 2023 Jt. CMC Statement 3; Pl.'s Mot. 4-5.  The remaining dispute centers around category 1, which ACLU describes as "a copy of the electronic law library in its native format."  *See* Pl.'s Mot. 5.  According to ACLU, "[t]he content, accuracy, accessibility, and operation of electronic law library materials that ICE provides to detained people is . . . a matter of public importance, and public disclosure of these materials will shed light on ICE's compliance with requirements to provide constitutionally adequate law library materials to people it detains and seeks to deport."  *Id*. at 3.

**B.    ICE's Contract with RELX Inc. for Electronic Law Library Materials**

ICE contracts with a third party to provide legal research materials to individuals detained in its facilities.  Jessica Jones is an ICE Management Program Analyst who serves as a Contracting Officer's Representative for electronic law library contracts.  Jones states that in December 2022, ICE contracted with RELX Inc. ("RELX"), which owns the LexisNexis Research Service, "for a subscription to the LexisNexis research service to provide access to legal research materials to detained noncitizens."  Jones Decl. ¶¶ 2, 4; Defs.' Mot. 1.  The contract provides that RELX "will deploy both the custom interface online/tablet solution for 45,000 detainees and maintain/update 250 external hard drives across the entire ICE network of facilities."  [Docket No. 34-1 (Dominguez-Ruiz Decl. Jan. 29, 2024) ¶ 5, Ex. A (RELX contract) at ECF pp. 4-6; Jones Decl. ¶ 5, Exs. A, B (RELX contract and attachments thereto).]  The Statement of Work attached to the contract specifies two methods for detainees to access legal research materials: 1) a "self-contained legal research system" that "must be fully functional without internet access," i.e., an

3

United States District Court
Northern District of California

1   offline system; and 2) an "online legal research system."  RELX contract at 3, 8.  Only the offline

2   "self-contained legal research system" is at issue in these motions.  *See* Pl.'s Mot. 6; Defs.' Mot. 3.

3   Defendants refer to the offline legal research materials as the "Offline Lexis Materials."  Jones

4   Decl. ¶ 4.[1]

5           Shawn O'Donnell, the chief of ICE's Office of Acquisition Management and the

6   Detention, Compliance and Removals unit, states "[t]he Offline Lexis Materials consist of

7   electronic databases containing legal research materials . . . and software necessary to utilize those

8   databases[.]"  [Docket No. 42 (O'Donnell Decl. Feb. 28, 2024) ¶¶ 1, 9.]  The Statement of Work

9   sets forth the databases RELX must include on the electronic hard drives and requires RELX to

10  update all resources on a quarterly basis.  Attachment B to the contract specifically identifies the

11  required databases.  RELX contract at 6, 7; Jones Decl. Ex. B.  Under the contract, RELX installs

12  on the electronic hard drives the contracted-for databases and software to make the databases

13  function offline.  It furnishes the Offline Lexis Materials to ICE solely on the electronic hard

14  drives and does not provide the materials on CD-ROM.  Jones Decl. ¶ 6.  Jones describes the

15  process as follows: RELX updates and services the electronic hard drives quarterly and sends them

16  to ICE detention facilities and Field Offices.  The contents of the electronic hard drives are then

17  uploaded to law library computers in the detention facilities.  Following the uploads, ICE ships the

18  electronic hard drives back to RELX.  Installation and troubleshooting issues are addressed by a

19  RELX technician.  *Id*. at ¶ 9.  Attachment D to the contract contains a Quality Assurance

20  Surveillance Plan, which provides that "the Service Provider [RELX], and not the Government, is

21  responsible for the day-to-day operation of the electronic law library and all the management and

22  quality control actions required to meet the terms of the Agreement."  Jones Decl. Ex. B at ECF p.

23  65.  RELX is required to submit monthly Quality Control reports to ICE.  *Id*.

24          According to Jones, "[t]he Offline Lexis Materials are maintained for the use of detained

25  noncitizens in ICE custody.  ICE personnel do not use the Offline Lexis Materials to conduct any

26  agency research or decision-making."  Jones Decl. ¶ 7.

27

28  ———————————
    [1] ACLU refers to the disputed materials as "electronic law library materials."  *See* Pl.'s Reply 1-2.
    The court uses the "Offline Lexis Materials" in this opinion as it is more precise.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

### C.    The Master Agreement

According to Defendants, ICE's contract with RELX is governed by a "LexisNexis Master Agreement" that restricts ICE's use of the Offline Lexis Materials in a manner relevant to the parties' dispute.  *See* Defs.' Mot. 11-14; O'Donnell Decl. ¶ 6, Ex. A ("Master Agreement").[2]

In relevant part, the Master Agreement grants the following license: "a non-exclusive, non-transferable limited license to access and use the Legal Research Service for your own internal use."  Master Agreement at ECF p. 1.  "Legal Research Service" includes "the Licensed Program, Materials, updates made available on Distributed Media or online, and related documentation." *Id*. at ECF p. 10.  The Master Agreement defines "you or your" to mean "the person or entity indicated on the signature page of the Order Form, the person or entity on whose behalf a click-through version of this Master Agreement is accepted, or any other person or entity that accesses or uses the Legal Research Service."  *Id*. at ECF p. 11.  It defines "us or we" to mean "the applicable LexisNexis Company," and defines "LexisNexis Company" as "LexisNexis, a division of Reed Elsevier Inc., Matthew Bender & Company, Inc., or any company that may become affiliated with them."  *Id*. at ECF p. 11.  The parties agree that Reed Elsevier, Inc. became RELX, Inc. in 2015.  *See* Pls.' Reply 11 & n.10; Defs.' Reply 3-4.

The Master Agreement contains certain "Restrictions on Use."  These restrictions provide that "you may not, nor may you permit others to: . . . copy all of any portion of the Legal Research Service," or "allow anyone other than yourself, your employees, and independent contractors working solely on your behalf to use the Legal Research Service[.]"  Master Agreement at ECF p. 2.  The Master Agreement further sets forth certain "Prohibited Uses," which provide that "[y]ou may not, nor may you permit others to: . . . use the Legal Research Service in any fashion that may infringe the copyright, intellectual property right, or proprietary or property right or interest of us or our Suppliers" or "make any portion of the Legal Research Service available to third parties through any timesharing system, service bureau, the Internet, or any other similar technology now existing or developed in the future."  *Id*. at ECF p. 3.

Finally, the Master Agreement states "[t]he Legal Research Service and any copyrights,

---

[2] ACLU disputes the applicability of the Master Agreement, as discussed below.

1  trademarks, patents, trade secrets, intellectual property rights, and other proprietary rights in and to

2  the Legal Research Service are owned by us and our Suppliers, and you obtain no right, title, or

3  interest therein." *Id*. at ECF p. 5.

4         **D.**      **Cross Motions for Summary Judgment**

5         Defendants contend that the Offline Lexis Materials are not agency records subject to

6  FOIA as a matter of law. They also contend that even if the Offline Lexis Materials qualify as

7  agency records, they are exempt from production pursuant to FOIA Exemption 4, which in

8  relevant part exempts "commercial or financial information [that is] obtained from a person and

9  [is] privileged or confidential." 5 U.S.C. § 552(b)(4).

10         ACLU contends that the requested materials are agency records that must be produced. It

11  also disputes the applicability of Exemption 4.

12         At the hearing, the court ordered Defendants to file supplemental evidence supporting their

13  claim that the Master Agreement governs the contract between ICE and RELX. It also ordered

14  ACLU to file a response to the supplemental declaration(s). Minute Order. The parties timely

15  filed the requested evidence and response. [Docket Nos. 57 (Supp. O'Donnell Decl. Aug. 5,

16  2024); 62 (ACLU's Supp. Reply).]

17  **II. LEGAL STANDARDS**

18         "FOIA 'was enacted to facilitate public access to Government documents.'" *Lahr v. Nat'l*

19  *Transp. Safety Bd.*, 569 F.3d 964, 973 (9th Cir. 2009) (quoting *U.S. Dep't of State v. Ray*, 502

20  U.S. 164, 173 (1991)). Its "'core purpose' is to inform citizens about 'what their government is up

21  to.'" *Yonemoto v. U.S. Dep't of Veterans Affairs*, 686 F.3d 681, 687 (9th Cir. 2012) (quoting

22  *Dep't of Justice v. Reporters Comm. for Freedom of the Press*, 489 U.S. 749, 773, 775 (1989)).

23  Congress structured FOIA so that an agency must disclose records "to any person . . . unless they

24  may be withheld pursuant to one of the nine enumerated exemptions listed in § 552(b)." *U.S.*

25  *Dep't of Justice v. Tax Analysts*, 492 U.S. 136, 150-51 (1989) (citation and quotation marks

26  omitted); *accord Maricopa Audubon Soc. v. U.S. Forest Serv*., 108 F.3d 1082, 1085 (9th Cir.

27  1997). These exemptions are "explicitly exclusive" and "must be narrowly construed in light of

28  FOIA's dominant objective of disclosure, not secrecy." *Maricopa*, 108 F.3d at 1085 (citations and

United States District Court
Northern District of California

6

quotations omitted).

A district court "has jurisdiction to enjoin the agency from withholding agency records and to order the production of any agency records improperly withheld" under FOIA.  5 U.S.C. § 552(a)(4)(B).  "Therefore, when an agency withholds documents, a threshold inquiry is whether they constitute 'agency records.'"  *Rojas v. Fed. Aviation Admin.*, 941 F.3d 392, 396 (9th Cir. 2019) (citing *Tax Analysts*, 492 U.S. at 142) (quotation omitted)).  "The burden is on the agency to demonstrate, not the requester to disprove, that the materials sought are not 'agency records' or have not been 'improperly' 'withheld.'"  *Tax Analysts*, 492 U.S. at 142 n.3.  Given "FOIA's strong presumption in favor of disclosure," the agency also bears the burden to "show that an exemption properly applies to the records it seeks to withhold."  *Hamdan v. U.S. Dep't of Justice*, 797 F.3d 759, 772 (9th Cir. 2015).  Further, "[a] basic policy of FOIA is to ensure that Congress and not administrative agencies determines what information is confidential."  *Lessner v. U.S. Dep't of Commerce*, 827 F.2d 1333, 1335 (9th Cir. 1987).  For this reason, courts do not give deference to a federal agency's determination that requested information falls under a particular FOIA exemption.  *Carlson v. U.S. Postal Serv.*, 504 F.3d 1123, 1127 (9th Cir. 2007).  If an agency determines that an exemption applies, the agency "may withhold only that information to which the exemption applies" and "must provide all 'reasonably segregable' portions of that record to the requester."  *Yonemoto*, 686 F.3d at 688 (quoting § 552(b)).

FOIA cases are typically decided on motions for summary judgment as the facts are rarely in dispute.  *See Minier v. Cent. Intelligence Agency*, 88 F.3d 796, 800 (9th Cir. 1996).  On a motion for summary judgment, district courts analyze the withholding of agency records de novo.  5 U.S.C. § 552(a)(4)(B).

### III. DISCUSSION

The parties dispute whether the Offline Lexis Materials are agency records subject to FOIA.  FOIA does not define "agency records."  In *Tax Analysts*, the Supreme Court provided a two-part test, holding that "a document is an agency record if (1) the agency 'either create[d] or obtain[ed] the requested materials,' and (2) the agency is 'in control of the requested materials at the time the FOIA request is made.'"  *See Rojas*, 941 F.3d at 407 (alterations in original) (quoting

1    *Tax Analysts*, 492 U.S. at 144-45).  The parties do not dispute that ICE "obtained" the Offline

2    Lexis Materials, satisfying the first part of the test.  Only the second part of the test regarding

3    ICE's "control" of the materials is in dispute.

4         Defendants argue that the Offline Lexis Materials do not qualify as agency records subject

5    to FOIA for two reasons: 1) as library reference materials, the Offline Lexis Materials are not

6    agency records subject to FOIA as a matter of law; and 2) ICE does not "control" the Offline

7    Lexis Materials under *Tax Analysts*.  Defs.' Mot. 10-14.

8         As to the first argument, Defendants cite *SDC Development Corp. v. Mathews*, 542 F.2d

9    1116, 1120 (9th Cir. 1976), and *Baizer v. U.S. Dep't of Air Force*, 887 F. Supp. 225, 229 (N.D.

10   Cal. 1995).  Defs.' Mot. 10.  Both are distinguishable.  In *SDC*, the Ninth Circuit addressed

11   "whether a complete reference library of medical writings and publications, accumulated and

12   stored in a computer data bank by" a federal agency, the National Library of Medicine,

13   "constitutes 'agency records' for purposes of" FOIA.  542 F.2d at 1117.  As part of its statutory

14   mandate, the National Library of Medicine maintained the databank, MEDLARS, which "stored

15   citations and abstracts of two million articles" from thousands of medical and scientific journals

16   worldwide on tapes.  *Id*. at 1117.  Users could access the database on a paid subscription basis

17   through the National Library of Medicine or purchase a current set of tapes from the government

18   for $50,000.  The plaintiff sought production of the MEDLARS tapes via FOIA request,

19   presumably to avoid the higher costs associated with a subscription or purchase.  The agency

20   denied the request.  *Id*. at 1117-18.

21        The court examined FOIA's legislative history and concluded that "the type of documents

22   Congress was seeking to include in the public disclosure provision of [FOIA] were primarily those

23   which dealt with the structure, operation, and decision-making procedure of the various

24   governmental agencies."  *Id*. at 1119.  The court recognized "a qualitative difference between the

25   types of records Congress sought to make available to the public by passing [FOIA] and the

26   library reference system" at issue: "[t]he library material does not directly reflect the structure,

27   operation, or decision-making functions of the agency, and where, as here, the materials are

28   readily disseminated to the public by the agency, the danger of agency secrecy which Congress

United States District Court
Northern District of California

sought to alleviate is not a consideration." *Id*. at 1120.  The court noted, "the agency is not seeking to mask its processes or functions from public scrutiny.  Indeed, its principal mission is the orderly dissemination of material it has collected," and the agency sought "to protect not its information, but rather its system for delivering that information." *Id*.  It found that "[r]equiring the agency to make its delivery system available [by FOIA request] at nominal charge" would "hamper [the information gathering and dissemination function of the agency] substantially" and concluded that the MEDLARS tapes "are not 'records' or 'agency records'" under FOIA.  *Id*.

In *SDC*, the FOIA request for the MEDLARS tapes did not seek information "about the internal workings of [the] government"; rather, the request sought to bypass the agency's system for delivering medical reference information where its "principal mission is the orderly dissemination of material it has collected." *See SDC*, 542 F.2d at 1119, 1120.  In contrast, ACLU's FOIA request is not an end run around the costs of acquiring reference materials from an agency charged with gathering such materials.  Instead, ACLU seeks production of research materials that reflect the outcome of ICE's decisions about how to satisfy its obligation to provide a law library to detainees.[3]  Moreover, *SDC* was decided before *Tax Analysts*.  As a result, its analysis is not grounded in *Tax Analyst*'s two-part test for determining whether materials qualify as agency records.  For these reasons, *SDC* does not control the outcome here.

Defendants also cite *Baizer*, in which the plaintiff made a FOIA request for an electronic copy of a "computer database containing the decisions of the United States Supreme Court" from the Department of the Air Force.  The Air Force denied the request on the ground that the database was not an agency record.  887 F. Supp. at 226.  The plaintiff filed a lawsuit under FOIA to compel production and the court dismissed the case for lack of subject matter jurisdiction because the "database is library reference material and is therefore not an 'agency record'" under FOIA. *Id*.  The court discussed *SDC*, noting that "the Ninth Circuit focused on the purpose of the FOIA— disclosure of records that 'dealt with the structure, operation, and decision-making procedure of

---

[3] The court notes that ACLU's FOIA request does not, however, request documents showing ICE's decision-making with respect to the Offline Lexis Materials or its deliberations regarding the same.  Instead, it seeks only the final product resulting from the agency's decisions.

1   the various governmental agencies'" and "reasoned that, because library reference material does

2   not provide any insight into agency decision making, it does not constitute an agency record."  *Id*.

3   at 228 (discussing *SDC*, 542 F.2d at 1119).  The court also considered the "control" requirement

4   from *Tax Analysts* and concluded that in both *Tax Analysts* and *SDC*, the courts "focused on how

5   the agency used the requested material":

> If an agency integrates material into its files and relies on it in decision
> making, then the agency controls the material.  If, on the other hand,
> material is maintained solely for reference purposes or as a research
> tool, then the indicia of control are lacking.

9   *Id*. at 227, 228 (citing *Tax Analysts*, 492 U.S. at 145).

10       The FOIA request in *Baizer* is distinguishable from ACLU's request, which does not seek

11   material "maintained solely for reference purposes"; rather, it seeks reference materials that are the

12   product of ICE's decision-making with respect to fulfilling its mandate to provide such materials

13   to detainees.

14       Defendants next argue that ICE does not "control" the Offline Lexis Materials under the

15   *Tax Analysts* test.  For purposes of FOIA, "control" "mean[s] 'that the materials have come into

16   the agency's possession in the legitimate conduct of its official duties,' or 'in connection with the

17   transaction of public business.'"  *Rojas*, 941 F.3d at 408 (quoting *Tax Analysts*, 492 U.S. at 145).

18   The Supreme Court has rejected the contention that "mere physical location of papers and

19   materials . . . confer[s] status as an 'agency record.'"  *See Kissinger v. Reps. Comm. for Freedom

20   *of the Press*, 445 U.S. 136, 157 (1980) (holding that notes that Henry Kissinger made while

21   serving in the Office of the President and physically brought to the State Department were not

22   "agency records").  "[E]mails or other documents that are unrelated to agency business are not

23   agency records, even if they are stored on the agency's server and used by an agency employee."

24   *Rojas*, 941 F.3d at 409 (citing *Kissinger*, 445 U.S. at 155-56).

25       The Ninth Circuit has not adopted a test "to determine whether specified records are in the

26   agency's possession in connection with agency-related business."  *See Rojas*, 941 F.3d at 408-09.

27   In *Rojas*, the Ninth Circuit discussed the D.C. Circuit's four-factor framework that pre-dates *Tax

28   *Analysts*, which the Supreme Court decided in 1989; that framework examines 1) "the intent of the

United States District Court
Northern District of California

10

document's creator to retain or relinquish control over the records"; 2) "the ability of the agency to use and dispose of the record as it sees fit"; 3) "the extent to which agency personnel have read or relied upon the document"; and 4) "the degree to which the document was integrated into the agency's record system or files." *See id*. (quoting *Tax Analysts v. U.S. Dep't of Justice*, 845 F.2d 1060, 1069 (D.C. Cir. 1988)).  Ultimately, the Ninth Circuit discounted the first and fourth factors and expressly declined to adopt the test.  It held instead that courts "may consider a range of evidence to determine" whether an agency "controls" a record for purposes of FOIA.  *Id*. at 409.

The parties dispute whether the Master Agreement limits ICE's use of the Offline Lexis Materials, which bears on the control inquiry.  Defendants argue that the Master Agreement's restrictions on ICE's use of the materials demonstrate ICE's lack of "control."  ACLU contends that Defendants have failed to establish that the Master Agreement applies to the Offline Lexis Materials.  Pl.'s Reply 11; Supp. Br. 3.

Defendants originally submitted somewhat conclusory evidence in support of their claim that the Master Agreement applies to ICE's contract with RELX.  Defendants offered a declaration by O'Donnell, who stated only that "ICE's use of the Offline Lexis Materials is subject to the terms of the LexisNexis Master Agreement" and that "[b]y purchasing a subscription to the Lexis Nexis Research Service" pursuant to the RELX contract, "ICE is a party to the Master Agreement."  O'Donnell Decl. ¶¶ 5, 6, Master Agreement at ECF p. 10 ("Agreement means this Master Agreement together with the Order Form").  O'Donnell did not provide details about when or how he obtained the Master Agreement and did not explain the basis for the statement that the Master Agreement governs ICE's contract with RELX.

As noted, the court granted Defendants leave to submit a supplemental declaration(s) supporting their claim that the Master Agreement governs the contract between ICE and RELX for the electronic law library.  In a supplemental declaration, O'Donnell states that prior to submitting his initial declaration, ICE contacted RELX to request a copy of the most recent version of the Master Agreement and RELX provided the copy of the Master Agreement that was attached to his original declaration.  Supp. O'Donnell Decl. ¶ 5.  Following the hearing, O'Donnell "made further inquiries to the [ICE] contract officer responsible for [the] RELX contract" and that they

1  "searched for additional records," and "contacted RELX for additional information."  He states

2  that based on these inquiries, he confirmed that the copy of the Master Agreement attached to the

3  original declaration "is identical to the Master Agreement that is included on each of the

4  [electronic hard drives] that are provided to ICE by RELX."  *Id*. at ¶¶ 6, 7.

5        O'Donnell also describes ICE's acceptance of the Master Agreement, which he states

6  "occurs as part of the installation of the Offline Lexis Materials . . . quarterly when updates are

7  provided by RELX."  *Id*. at ¶ 8.  The process is as follows:

> 8      Each time the quarterly updates are received, the Offline Lexis
> Materials and associated software are installed by an ICE employee
> 9  at the ICE facility where the Offline Lexis Materials are used.  During
> the installation process, the Master Agreement is displayed and the
> 10  installer must agree to the terms in order to complete the installation
> by selecting the option "I accept the terms of the license agreement"
> 11  and clicking the "Next" button.  An option to select "I do not accept
> the terms of the license agreement" also appears, however, the
> 12  installation will not proceed if the installer selects that option.  It is
> my understanding that the installer must, and always does, accept the
> 13  terms of the Master Agreement during the installation process, and
> that this has been occurring throughout the life of the RELX Contract.
> 14

15  *Id*.  Following the initial acceptance of the Master Agreement during each quarterly installation,

16  "the program does not again prompt users to affirmatively accept or acknowledge the terms of the

17  Master Agreement."  *Id*. at ¶ 10.

18        O'Donnell states that following the hearing, "ICE examined an [electronic hard drive]

19  provided by RELX and located the Microsoft Word file containing the Master Agreement, which

20  came preinstalled on the EHD and which appears as part of the installation process."  *Id*. at ¶ 9.

21  The preinstalled Microsoft Word file "contains the complete text of the Master Agreement," which

22  O'Donnell states is identical to the Master Agreement he submitted with his prior declaration.  *Id*.

23  The first page of the Microsoft Word file displays an image of the acceptance screen that appears

24  during the installation process, which confirms that the system prompts users to choose one of two

25  options before proceeding:

26

27

28

1
2
3
4
5
6
7
8
9
10
11
12



13   *Id*. at ¶ 9, Ex. A at ECF p. 2.

14          Based on his inquiries, O'Donnell understands that "the Master Agreement has been

15   included with the [electronic hard drive] and each quarterly update provided by RELX dating back

16   to prior contracts between ICE and RELX regarding the Offline Lexis Materials, for which ICE

17   has been contracting with RELX (and its predecessor companies) since at least 2012," and

18   "continues to be included with the" electronic hard drive.  *Id*. at ¶ 11.

19          In its response to O'Donnell's supplemental declaration, ACLU maintains that the Master

20   Agreement "does not apply to the law library."  Supp. Br. 3.  ACLU notes that the Master

21   Agreement references a "LexisNexis® CD," even though ICE contends that RELX furnishes the

22   Offline Lexis Materials on electronic hard drives only.  *Id*.; *see* Master Agreement at ECF p. 1;

23   Jones Decl. ¶ 6 ("Under ICE's current contract with RELX, RELX furnishes the Offline Lexis

24   Materials to ICE exclusively on EHDs and does not provide the materials on CD-ROM.").

25   However, by its terms, the Master Agreement applies to different forms of media.  It states on the

26   first page, "Your use of a Legal Research Service is subject to this Master Agreement" and defines

27   "Legal Research Service" to include "the Licensed Program, Materials, updates made available on

28   Distributed Media or online, and related documentation."  *Id*. at ECF pp. 1, 10.  In turn,

13

"Distributed Media means the floppy disc, CD-ROM, DVD-ROM, *external hard drive*, or other physical media now existing or developed in the future on which we furnish the Legal Research Service." *Id.* at ECF p. 10 (emphasis added). ACLU also notes that the original version of the Master Agreement submitted with Defendants' motion includes the following statement on the first page: "Copyright © 2010 LexisNexis®, a division of Reed Elsevier Properties Inc." Master Agreement at ECF p. 1. ACLU contends that "Reed Elsevier ceased to exist in 2015," long before ICE signed the operative contract with RELX, Supp. Br. 3, but this argument ignores the undisputed fact that Reed Elsevier, Inc. became RELX in 2015. *See* Pls.' Reply 11 & n.10; Defs.' Reply 3-4. The Master Agreement expressly defines "us or we" to mean "the applicable LexisNexis Company," and defines "LexisNexis Company" as "LexisNexis, a division of Reed Elsevier Inc., Matthew Bender & Company, Inc., *or any company that may become affiliated with them*." *Id.* at ECF p. 11 (emphasis added).

ACLU next objects that "critical" statements in O'Donnell's supplemental declaration lack foundation and are not supported by his own personal knowledge, including his statements that ICE accepts the Master Agreement as part of the installation of the Offline Lexis Materials and that O'Donnell understands "that the installer must, and always does, accept the terms of the Master Agreement during the installation process, and that this has been occurring throughout the life of the RELX Contract." Supp. Br. 4-5 (citing Supp. O'Donnell Decl. ¶ 8). ACLU also objects to O'Donnell's statement that he understands "that the Master Agreement has been included with the [external hard drive] and each quarterly update provided by RELX dating back to prior contracts between ICE and RELX" based on lack of personal knowledge. *Id.* (citing Supp. O'Donnell Decl. ¶ 11).[4] These objections are without merit. "An affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be

_____

[4] ACLU also states that "Mr. O'Donnell can only speculate to whether any changes have occurred to the Master Agreement 'over the course of the relationship between ICE and RELX' because he has only held his position as unit chief since 2020. Supp. Br. 5 (quoting Supp. O'Donnell Decl. ¶ 12). This ignores that O'Donnell describes ICE's search for and failure to "locate any records reflecting any changes to the Master Agreement" and states, "[b]ased on my inquiries, I am unaware of RELX providing ICE with . . . notice regarding changes to the terms of the Master Agreement." Supp. O'Donnell Decl. ¶ 12.

admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4).  Here, O'Donnell makes clear in his supplemental declaration that his statements about the Master Agreement are based on his "additional inquiries," including making "further inquiries to the contract officer responsible for the RELX Contract," and that he and the contract officer "searched for additional records, including any prior agreements or contract drafts, and communications related to the agreement," and that they "contacted RELX for additional information."  *See* Supp. O'Donnell Decl. ¶¶ 6-8.  He also states in paragraph 12 that his understanding about the inclusion of the Master Agreement with the external hard drive is "based on [his] inquiries." *See id.* at ¶ 12.

Additionally, ACLU objects that certain of O'Donnell's statements are based on hearsay, but the Ninth Circuit has clarified that at the summary judgment stage, the focus is not on the "admissibility of the evidence's form," but rather on the "admissibility of its contents."  *Fraser v. Goodale*, 342 F.3d 1032, 1036-37 (9th Cir. 2003) (citing cases); *see also JL Beverage Co., LLC v. Jim Beam Brands Co.*, 828 F.3d 1098, 1110 (9th Cir. 2016) ("[A]t summary judgment a district court may consider hearsay evidence submitted in an inadmissible form, so long as the underlying evidence could be provided in an admissible form at trial, such as by live testimony," citing *Fraser*).  Accordingly, district courts in this circuit have routinely overruled authentication and hearsay challenges at the summary stage where the evidence could be presented in an admissible form at trial, following *Fraser*. *See, e.g.*, *Lawrence v. City & Cty. of San Francisco*, 258 F. Supp. 3d 977, 986 (N.D. Cal. 2017) (overruling objections to admissibility of police reports on authentication and hearsay grounds at summary judgment because the contents of the report "may be presented in an admissible form at trial"); *Faulks v. Wells Fargo & Co.*, 231 F. Supp. 387, 397-98 (N.D. Cal. 2017) (overruling objections to admissibility of exhibit at summary judgment because "it is possible that the facts underlying [the exhibit] could be admissible at trial").  As Defendants could present their evidence about the Master Agreement in an admissible form, ACLU's objections to statements in O'Donnell's supplemental declaration based on hearsay are overruled.

The court concludes that Defendants have submitted sufficient evidence that their

1   installation and use of the Offline Lexis Materials is conditioned on acceptance of the Master

2   Agreement with RELX.  *See* Supp. O'Donnell Decl. ¶ 8; *Hamdan v. U.S. Dep't of Justice*, 797

3   F.3d 759, 770 (9th Cir. 2015) ("Affidavits submitted by an agency to demonstrate the adequacy of

4   its response are presumed to be in good faith.").  Accordingly, the court will consider its terms in

5   analyzing the "control" prong of the test.

6          As noted, "control" under FOIA "mean[s] 'that the materials have come into the agency's

7   possession in the legitimate conduct of its official duties,' or 'in connection with the transaction of

8   public business.'"  *Rojas*, 941 F.3d at 408 (quoting *Tax Analysts*, 492 U.S. at 145).  In *Rojas*, the

9   Ninth Circuit held that courts "may consider a range of evidence to determine whether specified

10  records are in the agency's possession in connection with agency-related business" and that

11  "evidence relating to the agency's use of documents (including its system for preserving,

12  retrieving, or disposing of the documents, and any reliance on the documents by agency

13  employees) may be relevant to this inquiry."  *Id.* at 409.  Here, ICE does not have the ability to use

14  and dispose of the Offline Lexis Materials as it sees fit.  Instead, any use of the materials is subject

15  to the terms of ICE's "non-exclusive, non-transferable limited license," which is limited by the

16  "Restrictions on Use" and "Prohibited Uses" set forth in the Master Agreement.  O'Donnell Decl.

17  ¶¶ 5-8 & Master Agreement.  Courts have held that similar contractual restrictions on use and

18  transfer of records placed them outside the agency's control and thus not subject to FOIA.  For

19  example, *Tax Analysts v. U.S. Department of Justice*, 913 F. Supp. 599, 607 (D.D.C. 1996) ("*Tax*

20  *Analysts II*"), involved a FOIA request for the portion of an electronic legal research database,

21  JURIS, provided by West Publishing Company ("West") to the Department of Justice ("DOJ")

22  pursuant to contract.  The contract contained licensing provisions that "greatly restrict[ed] DOJ's

23  right to use the data," including by prohibiting the use of the data outside the JURIS system, the

24  use of the data by anyone other than authorized JURIS users, the transfer or assignment of the

25  data, or the distribution of the data by JURIS users absent written agreement from the transferee,

26  among other restrictions.  *Id.* at 607.  The court found that "although DOJ certainly possessed the

27  West-provided data, its right to use, transfer and/or dispose of it was greatly restricted, and thus

28  DOJ did not 'control' the data in any common sense reading of that word."  *Id.*

1    Similarly, in *Gilmore v. U.S. Department of Energy*, 4 F. Supp. 2d 912, 918-19 (N.D. Cal.

2    1998), the court examined video conferencing software known as CLERVER for which the

3    government possessed a non-exclusive license to use for "government purposes."  The court held

4    that CLERVER was not an agency record because the Department of Energy's ("DOE") "right to

5    use CLERVER" was restricted in ways similar to *Tax Analysts II*.  4 F. Supp. 2d at 918-19

6    (discussing *Tax Analysts II*, 913 F. Supp. at 604).  The court concluded that "DOE lacks sufficient

7    control over CLERVER to make it an agency record of DOE."  *Id.* at 919.

8    In this case, ICE's use of the Offline Lexis Materials is restricted by its limited license, like

9    the systems at issue in *Tax Analysts II* and *Gilmore*.  In *Tax Analysts II*, West granted the DOJ a

10    nonexclusive license for limited use of the JURIS materials that specifically provided that West

11    remained the exclusive owner of the materials.  913 F. Supp. at 604.  In *Gilmore*, a third party

12    "own[ed] the copyright in CLERVER, but gave the government a limited license to use

13    CLERVER for government purposes only."  4 F. Supp. 2d at 922.  Here, ICE has "a non-

14    exclusive, non-transferable limited license to access and use the Legal Research Service for [its]

15    own internal use," while RELX remains the owner of the materials.  Master Agreement at ECF pp.

16    1, 5.

17    With respect to the agency's "reliance on" the materials, *see Rojas*, 941 F.3d at 409,

18    Defendants have submitted uncontroverted evidence that ICE personnel do not use the Offline

19    Lexis Materials to conduct any agency decision-making or agency research.  Instead, the Offline

20    Lexis Materials are maintained for the use of detained noncitizens in ICE custody.  Jones Decl. ¶

21    7.  *See Baizer*, 887 F. Supp. at 228 (if "material is maintained solely for reference purposes or as a

22    research tool, then the indicia of control are lacking.").

23    In response, ACLU disputes that the Master Agreement applies to the Offline Lexis

24    Materials.  Pl.'s Reply 11.  As discussed above, the court concludes that Defendants have

25    submitted sufficient evidence to support the Master Agreement's application to the materials.[5]

26    _____

27    [5] ACLU also argues that even if the Master Agreement applies to the Offline Lexis Materials,
     Defendants have not offered evidence "to show that they are bound by its terms," citing authority
28    on government contracting law.  Pl.'s Reply 12 (citing, e.g., *Trauma Serv. Grp. v. United States*,
     104 F.3d 1321, 1325 (Fed. Cir. 1997) ("A contract with the United States . . . requires that the

United States District Court
Northern District of California

ACLU also argues that ICE "intended to and retains control over" the Offline Lexis Materials, as evidenced by the contract and Statement of Work, which "lay out in painstaking detail the specific requirements, format, audience, screen display, content, research features, functionality, and form of the electronic law library." *Id.* at 10.  This argument appears to be based on the first factor of the D.C. Circuit's four-factor test for determining whether a document is in the control of an agency; that factor examines "the intent of the document's creator to retain or relinquish control over the records." *See Rojas*, 941 F.3d at 408 (quotation omitted).  As an initial matter, *Rojas* discounted this factor, noting that it "is in tension with" the Supreme Court's conclusion in *Tax Analysts* that "'the intent of the creator of a document' is not relevant to a determination of whether the document is an agency record[.]" *Id.* (citing *Tax Analysts*, 492 U.S. at 147 ("[s]uch a *mens rea* requirement is nowhere to be found in [FOIA].")).  Even if it were appropriate to consider intent, the first factor looks at the intent of the "document's creator"—in this case, RELX, which created the materials and licensed them to ICE.  ACLU offers no argument or evidence about RELX's intent with respect to the Offline Lexis Materials.  It also offers no authority that ICE's provision of detailed specifications for the services RELX must provide pursuant to the contract bears on the issue of control, where "[r]esponsibility for programming and maintaining the Offline Lexis Materials rests with the contractor, RELX, not the agency," *see* Jones Decl. ¶ 8, and RELX retains ownership of the Offline Lexis Materials.  Master Agreement at ECF p. 5.[6]

In sum, in light of governing Ninth Circuit authority and consideration of the evidence bearing on the question of Defendants' "control" over the requested materials, the court concludes that ICE lacks sufficient control over the Offline Lexis Materials to make them "agency records"

---

Government representative who entered or ratified the agreement had actual authority to bind the United States.")); Pl.'s Supp. Br. 6. This authority is inapposite as this is not a contract dispute. In any event, Defendants have submitted uncontroverted evidence that the Master Agreement governs ICE's use of RELX's materials. *See* Supp. O'Donnell Decl. ¶ 8.

[6] To the extent ACLU seeks to obtain documents reflecting ICE's intent or decision-making process with respect to "the specific requirements, format, audience, screen display, content, research features, functionality, and form of the electronic law library," the court notes that such documents are not part of the FOIA request at issue in this case, which only seeks the electronic law library itself.

United States District Court
Northern District of California

1    for purposes of FOIA.[7]  Accordingly, Defendants' motion for summary judgment is granted.

2    ACLU's motion is denied.

3    **IV. CONCLUSION**

4           For the foregoing reasons, Defendants' motion for summary judgment is granted.  ACLU's

5    motion is denied.  The parties shall immediately meet and confer regarding all outstanding issues.

6    By no later than October 11, 2024, the parties shall submit a brief joint letter describing any

7    remaining issues and a proposed schedule.

8

9           **IT IS SO ORDERED.**

10   Dated: September 20, 2024



                                                    Donna M. Ryu
                                                    Judge Donna M. Ryu
                                                    Chief Magistrate Judge

27   _____

     [7] Given the court's conclusion that the Offline Lexis Materials are not agency records under FOIA,
28   it need not reach Defendants' argument that the materials are protected from disclosure under
     FOIA Exemption 4.

United States District Court
Northern District of California